JOHN OWNBEY CO., Inc.

*v.*

G. HILTON BUTLER, Commissioner.

JOHN H. DANIEL CO., Inc.

*v.*

G. HILTON BUTLER, Commissioner.

SOUTHERN CENTRAL CO., Inc.

*v.*

ALFRED T. MACFARLAND, Commissioner.

GRAY & DUDLEY CO., Inc.

*v.*

G. HILTON BUTLER, Commissioner.

365 S.W.2d 33

(*Nashville,* December Term, 1962.)

Opinion filed February 7, 1963.

W. L. Ambrose, Jr., of Ambrose, Wilson & Saulpaw, Knoxville, for appellants Ownbey & Daniel.

CLARENCE CLIFTON, of Clifton, Mack & Kirkpatrick, Memphis, for appellant Southern Central Co.

KENNETH L. ROBERTS of Waller, Davis & Lansden, Nashville, for appellant Gray & Dudley.

GEORGE F. McCANLESS, Attorney General, Nashville, MILTON P. RICE, WALKER T. TIFTON, Assistant Attorneys General, Nashville, for appellee Commissioner.

## PER CURIAM.

All of these suits seek to recover excise taxes (sec. 67-2701 et seq., T.C.A.) paid by the taxpayer under protest. The Chancellors decided against the taxpayers. Appeals were seasonably perfected, briefed and argued. We must at the outset commend all counsel for the exceptionally fine presentation of their respective theories.

The legal solution of these four lawsuits is the same. The factual situation is different in each case, but this factual difference does not affect the outcome. They present two major questions, which are: (1) Can the Commissioner, after allowing the taxpayer to use and apply the apportionment formula of the statute (sec. 67-2707, T.C.A.) in excise tax cases for years, suddenly hold that such apportionment formula does not apply? (2) Under the factual situation of these cases are the taxpayers "doing business in Tennessee" under the meaning of the statute (sec. 67-2701, T.C.A.)? An affirmative answer to both questions is necessary to hold the taxpayer liable for the tax.

All of the appellants are Tennessee corporations and none of them is chartered or qualified to do business as a corporation in any state other than Tennessee. Ownbey manufactures garments. Daniel is in the business of selling custom tailored men's clothing. Southern Central is in the business of manufacturing school supplies and Gray & Dudley is in the business of manufacturing and marketing appliances. All appellants have principal offices in this State. None of the appellants has been called upon to pay or has paid to any other state a tax upon, or measured by, its net income.

The out-of-state activities carried on by these appellant corporations are, as follows: (1) Gray & Dudley Company aggregates approximately five (5%) per cent of its annual sales to customers within the State, while approximately ninety-five (95%) per cent of its sales are to customers in all other states. Approximately ninety (90%) per cent are made in the same manner as to customers within Tennessee, that is, through solicitation

of orders of manufacturers' representatives with shipment through channels of interstate commerce from Gray & Dudley to the out-of-state purchaser. Approximately eight (8%) per cent of these sales are to customers outside of Tennessee in such states as Massachusetts, Connecticut, New York, Louisiana and California, and are made through independent warehouses located therein. Gray & Dudley ships this approximately eight (8%) per cent of its goods to such out-of-state warehouses where manufacturers' representatives operating within such states make sales and deliveries direct to the customers from such warehouses. Such out-of-state purchasers are billed from Gray & Dudley's Tennessee office and payment is remitted thereto. Gray & Dudley likewise does about two (2%) per cent of its out-of-state sales to Louisiana and New York through agents of Gray & Dudley located there. This two (2%) per cent of goods is shipped to such agents and upon receipt is stored in the agent's warehouse. The sales and deliveries are made by the agents from their warehouse inventory. These agents receive all payments for such sales and maintain books and records, billings, etc., and a monthly inventory is submitted by these out-of-state agents to Gray & Dudley's Tennessee office, accompanied by a check in payment for the goods, and the agents in return are paid a commission.

(2) Southern Central Company solicits orders for its products mainly through its own officers traveling in foreign states for the purpose of soliciting these orders or through nonresident salaried traveling salesmen. A small percentage of their sales comes through commissioned brokers or salesmen. All orders are transmitted to the home office of Southern Central in Memphis for ac-

ceptance or rejection. Where orders are accepted sales are made upon a delivered basis.

(3) The John Ownbey Company negotiates contracts with the United States government to sell manufactured clothing which is subsequently delivered to designated governmental installations. The bulk of the component materials for the clothing is acquired by the Ownbey Company outside of Tennessee.

(4) The Daniel Company, through salesmen, solicits orders for made-to-measure men's clothing, which orders are transmitted to Daniel's Tennessee office for acceptance or rejection. When such orders are accepted, they are filled by having the clothing manufactured by others under contract with the Daniel Company and then shipped c. o. d. to the purchaser. Additionally, it purchases cloth or piece goods outside of Tennessee.

In all four cases the controversy arose out of recomputation by the Commissioner of the respective corporations' excise tax liability for a year or years ending in 1959 or later. In each case the appellant had filed its return in due time and had paid the tax shown as the appellant had computed its return. In computing its tax each corporation had undertaken to apportion its net earnings to Tennessee as a corporation "doing business in Tennessee and elsewhere" within the meaning of sec. 67-2706, T.C.A., using the allocation formula appropriate to the character of its business, which was either manufacturing (sec. 67-2707, T.C.A.), or merchandising (sec. 67-2708, T.C.A.), as it had always done theretofore.

After these respective returns were received the Commissioner duly informed the corporations that they were

not allowed to use the apportionment formula and enclosed with the letter so informing the company certain information as to why this was done. In other words generally the reason it was done, the Commissioner through advice of the Attorney General had reached the conclusion that since Congress had passed Public Law 86-272, 73 Stat. 555, that these sales to states outside of Tennessee and the way in which they were conducted, as heretofore set forth, could not be taxed in interstate commerce, and thus it became the duty of the Commissioner to tax all of said sales because they were really business done within Tennessee in view of the recent holding in this State that by similar transactions of these corporations in other states they were not doing business in that state so that service of process might be had on the corporation there. As we see this record this is the reason for the change and for no longer allowing these appellants to use the apportionment formula.

In other words, the Commissioner on advice from the Attorney General reached the conclusion that the defendant corporations were not engaged in corporate business elsewhere than in Tennessee within the meaning of the excise tax statute (sec. 67-2701 et seq.) and thus accordingly certain deficiencies were found against each corporation and these suits were brought to recover the various amounts paid under protest.

The manufacturers' allocation formula (sec. 67-2707, T.C.A.) specifies three factors, each of which compares Tennessee value to total value in the categories of (1) tangible property, (2) manufacturing cost, and (3) sales. The merchandising formula (sec. 67-2708, T.C.A.) does likewise with respect to the factors of (1) property, (2)

sales as to origin, and (3) sales as to destination. The average of the three factors in each case is the proportion of net earnings allocable to Tennessee.

All of these corporations, as said above, had shown a Tennessee factor of a hundred (100%) per cent with respect to the first two factors. As to the third factor, that is, the sales, the Ownbey Company showed a Tennessee ratio of no per cent; the Daniel Company showed a Tennessee ration of 20.91 per cent; Southern Central showed a Tennessee ratio of fifteen (15%) per cent; and Gray & Dudley a Tennessee ratio of 5.13 per cent.

In other words each of these corporations acted upon the theory that its income for the years for which returns were made was derived both from intrastate and interstate business within the meaning of the excise tax statute, and they proceeded accordingly to follow the formula for allocation, above referred to, and to allocate for taxation in Tennessee only the portion thereof attributable by them to business transacted wholly within Tennessee and thus on this theory they submitted their returns.

The Commissioner, as above said, disagreed with this theory and proceeded to make an additional assessment to each corporation to include the net income from that portion of the business which is claimed by the corporations to be interstate commerce.

All corporations organized for profit under the laws of Tennessee and doing business in Tennessee shall annually pay an excise tax of a certain amount on their net earnings "from business done within the state." (sec. 67-2701, T.C.A.). Where the corporation does business

in Tennessee and elsewhere the net earnings are apportioned in accordance with the statutes above referred to (sec. 67-2707 to sec. 67-2712, T.C.A.) and the net earnings as thus apportioned to Tennessee shall be deemed the earnings arising from business done within the State. Sec. 67-2706, T.C.A.

This excise tax law originated in 1923. It was amended as it now stands by the Legislature in 1937 by Chapter 99 and by Chapter 176. After this amendment this Court in a well considered case, opinion prepared by the late Chief Justice Green, *Memphis Natural Gas Co. v. McCanless,* 180 Tenn. 695, 177 S.W.2d 843, had this statute, which is now carried in the Code as sec. 67-2701 et seq., before it. The Court in the Memphis Natural Gas Co. case had the following to say, which is very pertinent under the factual situation presented in these cases, with reference to the intent of the excise tax statute:

"It will be observed that sec. 1316 of the Code bases the excise tax on net earnings 'arising from business done wholly within the state, excluding earnings arising from interstate commerce.' Chapter 99 of the Public Acts of 1937 bases the tax on net earnings 'from business done within the State.' The change of phraseology in the amendatory statute is too significant to be escaped. By the failure of the Act of 1937 to exclude earnings 'arising from interstate commerce,' which were expressly excluded in the Code sections before re-written, it must be concluded that the lawmakers intended to include earnings from interstate commerce as far as they could. And again the Code section based the tax on earnings from business done *wholly* within the State, while the amendatory Act based the tax on

*business done within the State.* The omission of *wholly* in this connection cannot be ignored in undertaking to arrive at the meaning of the amendment.

"Section 1316 of the official Code of 1932 was founded on Chapter 21 of the Public Acts of 1923 and Chapter 44 of the Public Acts of 1927. Between the enactment of these statutes and the Public Act of 1937 the Supreme Court of the United States had delivered a number of opinions in which the right of the States to base taxes on earnings from corporations from interstate business had been clarified and apparently broadened. See subsequent quotation from *Memphis Natural Gas Co. v. Beeler* [315 U.S. 649, 62 S.Ct. 857, 86 L.Ed. 1090]. These decisions were familiar to the Legislature in 1937 and we think it was the intention of that body in the enactment of Chapters 99 and 176 to take advantage of these rulings. In other words, to reach earnings from interstate business of corporations as far as possible."

The above reasoning was in a case of a foreign corporation doing business in Tennessee. This reasoning has a stronger significance when applied to domestic corporations as are the appellants. Thus we have a pronouncement made by this Court in 1943 that these transactions of these different corporations in sending their goods into other states were intended by this Act to be taxed.

From 1943 up until 1959 when the Commissioner reached the conclusion under the advice of the Attorney General that business done by these corporations should be taxed, this business done by these corporations herein was not taxed by the Commissioner presumably because other states into which these goods went might tax the

corporation for goods thus sent in interstate commerce and in this way there would be a double taxation. Thus the Commissioner readily realized that he probably could not uphold the tax. Congress passed Public Law 86-272, 73 Stat. 555. sec. 101(a), Title 15, sec. 381(c), U.S.C.A., which became effective on September 14, 1959, and this Act provided in effect that no state would have the power to impose a net income tax upon income derived from interstate commerce if the only business activities within the state by the taxpayer are the solicitations of orders for sales of tangible personal property, which are sent outside of the state for approval or rejection, and if approved are filled by delivery from outside the state. A very enlightening article is found on this statute in 46 Va. Law Review, page 1241. Among other things the writer of that article says of this Public Law 86-272, that:

"The general effect of Public Law 86-272 is to provide guidelines, established by Congress, as to what constitutes 'doing business' within a state for the purpose of determining that state's power to impose a net income tax on income derived from interstate commerce. The act does not expressly or affirmatively indicate what activities are to be considered 'doing business' so as to permit the exercise of state taxing jurisdiction. Instead, it specifies certain minimum activities which can be carried on within a state by a person engaged exclusively in interstate commerce with the assurance that none of his income can be taxed by such state or political subdivision."

Thus in view of these things, that is this Public Law, and a recent holding by the Court of Appeals of this State in *Fisher v. Trion, Inc.*, 49 Tenn.App. 182, 353 S.W.

2d 406, wherein certiorari was denied by this Court, that court in a well reasoned opinion adopted the majority rule under a factual situation as presented by the facts in the cases now before us and held that corporations doing business as these Tennessee corporations were in these foreign states were not doing business within those states so as to subject themselves to service of process. Thus it was that in view of these things that the Commissioner changed the order, or rules that he had had theretofore, and disallowed this apportionment formula.

Each corporation very ably and vigorously argues, and almost convincingly so, that it had a right to rely upon the previous construction by the Commissioner of the excise tax statute in allowing it to apply the apportionment formula. In this argument, of course, the leading case of *New England Mut. Life Ins. Co v. Reece,* 169 Tenn. 84, 83 S.W.2d 238, is relied upon. The opinion in this case was likewise written by the late Chief Justice Green and is well reasoned. After thoroughly considering the case though and thinking about the matter for a number of days, we have concluded that the principle established in this case is not applicable here. The statute (sec. 67-2701, T.C.A.) here involved is not ambiguous or doubtful. The Court is called upon to reach a legal conclusion under the facts of this case as to whether or not, under these facts they constitute doing business in this State.

██ What is more or less relied upon by the argument in this case is that the State is now estopped and precluded from changing this formula. Of course, though, where there is a failure on the part of the State to attempt to collect taxes even though it might have resulted from a misconstruction of the law, or might have been

a gratuity, or was not attempted for the reasons hereinbefore expressed, the State cannot be estopped. See *Esso Standard Oil Company v. Evans,* 194 Tenn. 377, 250 S.W.2d 569, and particularly at page 386 of the Tennessee Report, where this question is considered and the very respectable authority cited there for the conclusion reached. This Court there cites *American Bemberg Corp. v. Carson,* 188 Tenn. 263, 219 S.W.2d 169, to the same effect. In the Esso Standard Oil case the State had made no demand for the taxes when they became due and the officers acquiesced in the nonpayment of taxes. In the American Bemberg case the State had allowed the American Bemberg Corporation to apply the hardship formula, which was used both for excise and franchise taxes and had changed the rule to enforce the statutory formula against the taxpayer. The same authorities are cited in the American Bemberg case as those cited in the Esso Standard Oil case. We are convinced that this is the correct rule to follow. It is the duty of the Commissioner to collect all legal taxes that he can within his jurisdiction. It is likewise his obligation and duty to take the advise of the Attorney General when he concludes such a tax is due under the Act that the Legislature passes, then to collect this tax regardless of whom it is against or whatnot until said taxing statute is held illegal or void.

We next come to the question of whether or not the business of this corporation and what they did, in other words what the Commissioner attempted to tax, was business done within the State. The corporation is taxed for business done within the State, and we must decide whether or not under the factual situation heretofore set forth all the values the Commissioner attempted

to tax represented business done within the State. This, of course, presents a very interesting and complicated question. The definition of business and doing business within the State, etc., occupies literally hundreds of pages in law books. As a beginner one might take 12 C.J.S. for the definition of business and doing business and could spend days reading these various definitions, but each case must be bottomed on its own factual background. The mere fact that a corporation doing business in these foreign states as these corporations were could not be served with process in that state is not determinative of the question. Ordinarily the doing of business in a state for tax purposes necessitates a much broader meaning to be given to the words than in the case of service of process. 23 Am.Jur., page 339, sec. 362. That work in effect gives the reason why the activities of a corporation in the state wherein it is incorporated and given all the privileges and rights that it has for being incorporated in this state, receives the protection of the local laws and makes the question of whether or not this statute applies broader than in the case of a service of process statute.

In Fletcher on Corporations, 1955 Revised Volume, Vol. 18, sec. 8804, page 891, will be found a very interesting and authoritative discussion on doing business in this connection. This authority likewise says that a much broader meaning should be given to the words, "doing business," as used in a tax statute than when used in connection with necessary conditions precedent to admission into the state. In our study of the matter we find that there are a legion of cases on the question of "doing business." One could almost spend a year or so reading all these cases, but in a survey and review there are perti-

nent cases which factually somewhat meet the situation here. Among the many cases found and one that is cited in Fletcher, supra, is that of *Redwine v. Schenley Industries, Inc.*, 210 Ga. 769, 83 S.E.2d 16. In this case an unlicensed nonresident distilling company made sales by orders from wholesale purchasers to company agents in the state, such sales being subject to acceptance or rejection of the company outside the state and the title passing to the goods f. o. b. shipping point outside the state. The company was held not doing business for the purpose of state income tax. Obviously this is the converse of the present cases but the reasoning fits here. Another similar case is cited, *Curlee Clothing Co. v. Oklahoma Tax Commission*, 180 Okl. 116, 68 P.2d 834, where the corporation through soliciting agents took orders in the state and made collections of a portion of the purchase price thereof subject to approval of the corporation in its home office outside the state, and it was there held that this does not constitute doing business in the state within the meaning of the income tax laws. In reviewing these general works there will be found a number of cases supporting what we think is the correct conclusion under the factual situation in this case. One case in particular that is in point is *Montag Bros. v. State Revenue Commissioner*, 50 Ga.App. 660, 179 S.E. 563, affirmed 182 Ga. 568, 186 S.E. 558. That case held that no apportionment or allocation of income is required where a resident or domesticated corporation makes sales of its products manufactured within the state both within and without the state where the controlling features in the process of disposing of the articles produced are within the state. A similar holding was by a Wisconsin Court in *Trane Co. v. Wisconsin Tax Commission*, 235 Wis. 516, 292 N.W. 897. Any

number of cases may be found by reference to 85 C.J.S. Taxation sec. 1096.

█ It seems to us that clearly the undisputed facts in these cases show that these are Tennessee corporations with Tennessee operations done wholly in Tennessee controlled by Tennessee home offices; that the orders and contracts are subject to acceptance in the home office; that the shipments are made from Tennessee headquarters; and that no place of business is maintained elsewhere; therefore the only conclusion to reach is that all the corporate earnings are inevitably realized at the respective Tennessee offices.

█ It seems to us that the tax here does not discriminate against interstate commerce, but taxes it at the same rate as it taxes local commerce.

█ The burden is upon the taxpayer to show that he or it comes within the intendment of an apportionment formula to such an extent that he is actually engaged in business in a corporate form in states other than Tennessee. These corporations have wholly failed to establish such as a fact. *Dickey Clay Mfg. Co. v. Dickinson,* 200 Tenn. 25, 289 S.W.2d 533.

Gray & Dudley shows that a very small portion of its business is conducted from out-of-state locations. The portion of the business which might be considered as being done there is so small that it really does not make any difference or show that the apportionment formula should follow. If it so happened that this very, very small percentage of business that is claimed to be done is done, and there are certain statutes under which things done there might be taxed, if they are taxed, it is perfectly

easy for Gray & Dudley to make this known in making its return and the Commissioner can adjust the matter at the time. We think though that under the showing here all of the business that is done by Gray & Dudley comes in the same category that emanates for reasons hereinbefore set forth purely from Tennessee as business done within Tennessee.

This is supported, too, by the Bemberg case, supra, wherein a similar argument was made as to the taxation of some of Bemberg's things in New York and Tennessee, and particularly at page 276 of our Report. So far there is absolutely no showing here that any of the sales by any of these corporations had been subjected or even threatened to be subjected to taxation by any other state. The burden, of course, is on the corporation claiming such to show it.

An interesting article on the questions here involved will be found in 25 Minn.Law Review, 851, 877, 893, entitled, "Watson, Allocation of Business Income for State Income Tax Purposes." The author, we think, correctly reached the conclusion therein that a corporation is not doing business outside of the state by virtue of the fact that its products are sold from warehouses in other states by independent brokers. This, of course, answers one of the contentions made herein.

We think Gray & Dudley's contention that the tax on its entire net income would be violative of the commerce and due process clauses of the Federal Constitution is fully answered in such cases as *Matson Navigation Co. v. State Board of Equalization,* 297 U.S. 441, 56 S.Ct. 553, 80 L.Ed. 791; *Western Cartridge Co. v. Emmerson,* 281 U.S. 511, 50 S.Ct. 383, 74 L.Ed. 1004; *Hump Hairpin Mfg.*

*Co. v. Emmerson,* 258 U.S. 290, 42 S.Ct. 305, 66 L.Ed. 622; *American Mfg. Co. v. St. Louis,* 250 U.S. 459, 39 S.Ct. 522, 63 L.Ed. 1084.

The case of *F. S. Royster Guano Co. v. Va.,* 253 U.S. 412, 40 S.Ct. 560, 64 L.Ed. 989, is easily distinguished from the Gray & Dudley facts here. The Royster Company had plants both in Virginia and elsewhere and it objected to paying a tax to Virginia based on its entire income. It was under such circumstances that the Supreme Court of the United States held that the tax was discriminatory. There is no such factual situation herein on which such a claim could be based.

For reasons herein expressed we are satisfied that the judgments of the Chancellors are correct and they must therefore be affirmed.